UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHIMON WEINBERGER,<br><br>       Plaintiff,<br><br>v.<br><br>S. JOSHUA KAHANE,<br><br>       Defendant. | Civil Action No. _____ |

**INTRODUCTION**

This action arises from an extraordinary breach of professional duty.

Defendant S. Joshua Kahane, an attorney admitted to practice in Tennessee, entered an appearance in federal court on behalf of Plaintiff Shimon Weinberger without authorization, without consultation, and without ever speaking to him. Acting in Plaintiff's name, Defendant filed pleadings, made binding judicial admissions—including admitting execution of a forged personal guaranty—and aggressively litigated a foreclosure action that placed Plaintiff's personal assets at risk.

Defendant never informed Plaintiff of the existence of the lawsuit.

For months, Plaintiff remained unaware that he had been sued in federal court, that an Answer had been filed in his name, that personal guaranty liability had been admitted, and that litigation strategy was being executed purportedly on his behalf. Plaintiff discovered the case only after independently conducting internet searches due to growing concern over irregularities and lack of transparency from his business partner.

By the time Plaintiff uncovered the existence of the action and retained independent counsel, critical litigation positions had already been taken without his consent. Receiver proceedings were underway. The foreclosure process was advancing. Opportunities to contest liability, pursue immediate cure, or negotiate resolution before positions hardened had been materially compromised.

As a direct and foreseeable result of Defendant's unauthorized and tortious conduct, Plaintiff lost the real property known as "Sunrise Villas", lost substantial equity, incurred significant legal expenses, and suffered cascading financial harm affecting other business holdings.

This lawsuit seeks accountability for an attorney who acted without authority, bound a client to admissions he never authorized, falsely admitted that a guaranty was signed, concealed material proceedings from that client, and deprived him of the opportunity to protect his own interests.

## PARTIES

1. Plaintiff Shimon Weinberger is a resident of the State of New York and an investor and member of multiple real estate holding entities, including Sunrise Villas, LLC.

2. Defendant S. Joshua Kahane is an attorney licensed in the State of Tennessee and a partner at a Memphis, Tennessee law firm. At all relevant times, Defendant purported to represent Plaintiff in federal litigation styled Federal National Mortgage Association v. Sunrise Villas, LLC et al., Case No. 2:25-cv-02217 (W.D. Tenn.).

## SUBJECT MATTER JURISDICTION

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). Plaintiff Shimon Weinberger is a citizen of the State of New York. Defendant S. Joshua Kahane is, upon information and belief, a citizen of the State of Tennessee and is domiciled there. Complete diversity of citizenship exists between the parties. The amount in controversy exceeds $75,000,

exclusive of interest and costs, as Plaintiff has suffered the loss of substantial equity in the Sunrise Villas property, incurred significant legal fees, sustained financial harm affecting other real estate holdings, and seeks compensatory and punitive damages in an amount to be determined at trial but well in excess of the jurisdictional threshold.

**PERSONAL JURISDICTION**

4. This Court has personal jurisdiction over Defendant pursuant to New York's long-arm statute, N.Y. C.P.L.R. § 302(a)(1) and § 302(a)(3).

5. Defendant purposefully directed tortious conduct toward Plaintiff, a known New York resident, by entering an appearance on Plaintiff's behalf in federal litigation without authorization, making binding judicial admissions in Plaintiff's name, and conducting litigation strategy that materially affected Plaintiff's financial interests. Defendant knew Plaintiff resided in New York and that any personal guaranty exposure, litigation expense, and financial harm would be borne in New York.

6. Defendant transacted business with and on behalf of a New York resident and projected himself into a continuing professional relationship affecting Plaintiff's rights and obligations, thereby invoking the benefits and protections of New York law within the meaning of C.P.L.R. § 302(a)(1).

7. In addition, Defendant committed tortious acts outside New York causing injury within New York, including economic and reputational injury sustained by Plaintiff in this State. Defendant knew or should have reasonably expected his unauthorized representation and judicial admissions would have consequences in New York, and he derives substantial revenue from interstate legal practice. Accordingly, jurisdiction is proper under C.P.L.R. § 302(a)(3)(ii).

8. The exercise of personal jurisdiction over Defendant comports with due process because Defendant's conduct was purposefully directed at a New York resident, the claims arise directly from that conduct, and Defendant could reasonably anticipate being haled into court in New York for injuries he knowingly caused here.

## VENUE

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District and a substantial part of the injury was sustained here. Plaintiff is a resident of this District. Defendant's unauthorized representation, binding judicial admissions, and litigation conduct were intentionally directed at Plaintiff in New York and caused economic injury to Plaintiff in this District, including personal guaranty exposure, loss of equity, financial disruption to New York-based business interests, and legal expenses incurred here.

## FACTUAL BACKGROUND

**A. Plaintiff's Investment and the Hidden Refinancing**

10. Plaintiff invested millions of dollars in multifamily real estate projects operated in conjunction with husband and wife Zev and Matty Wercberger, including the property known as the Sunrise Villas Apartments in Memphis, Tennessee (the "Property").

11. Sunrise Villas, LLC owned the multifamily property known as Sunrise Terrace Apartments located at 2080 Winchester Road, Memphis, Tennessee (the "Property").

12. Plaintiff was not involved in day-to-day management. He relied on his partners to provide transparency and financial reporting. Over time, however, Plaintiff's repeated requests for

information about performance, occupancy, refinancing activity, and property condition were met with silence, delay, or evasive responses.

13. In October 2022, Plaintiff received a one-off message informing him that the Property had been refinanced. He was not consulted beforehand. He was not provided documentation. He was not advised of any personal guaranty. Had Plaintiff known of the deteriorating condition and low occupancy levels later alleged in the Fannie Mae complaint, he would not have consented to such refinancing.

14. Unbeknownst to Plaintiff, documents were being executed and filed in his name.

**B. The Forged Guaranty**

15. The Property was financed through a loan ultimately held by the Federal National Mortgage Association ("Fannie Mae"). In connection with that loan, a document styled as a "Guaranty of Non-Recourse Obligations" (the "Guaranty") was purportedly executed by certain individuals, including Plaintiff.

16. The Fannie Mae action ("FM Action") is premised on a document styled as a "Guaranty of Non-Recourse Obligations," which purports to bear Plaintiff's signature.

17. Plaintiff never signed that document.

18. Plaintiff never saw that document, until he later discovered it on the public docket in legal filings.

19. Plaintiff never authorized anyone to sign such a guaranty on his behalf.

20. The signature appearing on the guaranty bears no resemblance to Plaintiff's genuine signature.

21. A plain comparison of Mr. Weinberger's true signature to the purported signature on the Guaranty makes the forgery self-evident.

22. An exemplar of Mr. Weinberger's signature is:

**PR 2809 LLC**

By: _____
SHIMON WEINBERGER
Managing Member

23. In contrast the forged signature taken from the signature page on the Guaranty appears as:

**GUARANTOR:**

_____
Shimon Weinberger

Address for Notices to Guarantor:
85 Skillman Street, Apt 6F
Brooklyn, New York 11205
Email address: zevwerb@gmail.com

24. The address listed on the Guaranty as the "notice" address for Mr. Weinberger as purported guarantor — 85 Skillman Street, Apt 6F, Brooklyn, New York — is not an address where Mr. Weinberger works or resides. Instead, 85 Skillman Street is the address associated with the Wercbergers.

25. The e-mail address used as "notice" address for Mr. Weinberger as purported guarantor — zewerb@gmail.com — does not belong to Mr. Weinberger. Instead, it belongs to Matty Wercberger and/or Zev Wercberger.

26. Plaintiff's name and identity were used without authorization in connection with loan documents and related filings.

**C. The Federal Lawsuit Filed Without Plaintiff's Knowledge**

27. On February 26, 2025, Fannie Mae filed suit in the Western District of Tennessee seeking foreclosure and enforcement of the purported guaranty (the "FM Action").

28. Plaintiff was never served.

29. An affidavit of service later filed in the case claimed personal service at 85 Skillman Street and described a "White male, black hair, 200-220 lbs., 6'–6'3" tall."

30. Plaintiff is approximately 5'8", weighs approximately 155 pounds, and has light brown hair. He does not live or work at that address.

31. 85 Skillman Street is an address associated with the Wercberger's. A search of public records reveals this address to be one of the Wercberger's residences.

32. Plaintiff had no knowledge whatsoever that he had been sued.

**D. Defendant's Unauthorized Appearance**

33. Upon information and belief, Defendant was retained by Matty Wercberger and/or Zev Wercberger in connection with the defense of the FM Action, and not by Plaintiff.

34. Upon information and belief, Defendant's appearance and litigation conduct in the FM Action were undertaken at the direction of and in coordination with the Wercbergers, and materially advanced their interests in the dispute.

35. Without ever contacting Plaintiff, without obtaining consent, and without authority, Defendant S. Joshua Kahane entered an appearance in the FM Action purporting to represent Plaintiff.

36. Fannie Mae's complaint in the FM Action included an allegation in paragraph 16 that "On October 26, 2022, Guarantors executed that certain Guaranty of Non-Recourse Obligations ("Guaranty")," and a separate allegation in paragraph 74 that "Guarantors executed the Guaranty that secures the Loan."

37. Defendant filed an Answer on Plaintiff's behalf.

38. In that Answer, in numbered responses to both paragraph 16 and 74, Defendant expressly admitted that the Guaranty "was executed."

39. Defendant made this admission despite never having spoken to Plaintiff, never verifying authenticity, and never obtaining authorization to concede execution of a personal guaranty.

40. At no point did Defendant inform Plaintiff:

   a. That Plaintiff had been sued in his individual capacity;

   b. That Defendant had appeared in the action;

   c. That Defendant had admitted execution of a guaranty;

   d. That receivership was being sought;

   e. That foreclosure was being pursued.

41. Plaintiff never retained Defendant.

42. Plaintiff never communicated with Defendant.

43. Plaintiff never authorized any filing made in his name.

44. At all relevant times, Defendant acted in a manner aligned with the interests of the Wercbergers rather than the interests of Plaintiff, despite purporting to represent Plaintiff.

45. On information and belief, Defendant's adversarial posture and refusal to facilitate resolution were consistent with and designed to protect the financial and litigation interests of the Wercbergers, even where doing so prejudiced Plaintiff.

**E. Plaintiff's Discovery of the Lawsuit**

46. In early May 2025, after months of unanswered inquiries concerning multiple properties and growing suspicion regarding financial irregularities, Plaintiff began conducting independent online searches.

47. While searching the term "Sunrise Villas," Plaintiff was shocked to discover that he had been personally named as an individual defendant in a federal lawsuit in Tennessee.

48. This was the first time Plaintiff learned of the FM Action.

49. He immediately began researching to uncover what he could in an effort to understand what was going on. That process required time due to the profound lack of transparency surrounding the various real estate investments he had made with the Wercbergers and the severely limited information that had been provided to him over the preceding months and years.

50. As Plaintiff began reconstructing events, he uncovered a complex web of refinancing transactions, shifting funds, undocumented financial activity, and unexplained property-level cash movements. On information and belief, Plaintiff had been made the target of a broader scheme involving Zev and Matty Wercberger and others, through which millions of dollars purportedly invested in properties were diverted or drained through refinancing transactions and related maneuvers undertaken without his knowledge or authorization.

51. The FM Action appeared to be an extension of that pattern. Plaintiff was forced to reconstruct, piece by piece, what had occurred in his name and without his knowledge.

52. To do so, Plaintiff had to obtain title records, court filings, review pleadings submitted in his name, investigate the purported guaranty, compare signatures, analyze notice addresses and email discrepancies, and retain independent legal counsel capable of assessing the rapidly evolving procedural posture of the case.

53. The time required to perform that due diligence was the direct result of Defendant's failure to inform Plaintiff of the lawsuit and the surrounding circumstances.

54. After retaining counsel and reviewing the pleadings filed in his name, Plaintiff, through counsel, promptly notified Defendant in writing that Defendant had filed an appearance and Answer without authorization and without ever contacting Plaintiff. That written communication, dated May 15, 2025, expressly stated that Defendant's purported representation of Plaintiff was unauthorized and improper.

55. Despite being placed on actual notice that his authority was disputed, Defendant did not immediately withdraw his appearance. Instead, he continued to act as counsel of record for Plaintiff in the FM Action until the issue was formally raised through motion practice, including Plaintiff's motion to strike the unauthorized appearance.

### F. Litigation Escalated and Receiver Proceedings Without Plaintiff's Knowledge or Consent

56. While Plaintiff remained unaware of the case, Defendant engaged in aggressive motion practice, including contesting property inspection issues and opposing relief sought by Fannie Mae.

57. On information and belief, Defendant submitted selectively curated photographic materials and representations that minimized the apparent deficiencies at the Property and resisted full inspection access, thereby escalating the dispute rather than facilitating resolution.

58. The alleged defaults at issue centered substantially on property condition and a demanded repair escrow deposit.

59. On information and belief, Fannie Mae was willing to halt foreclosure proceedings upon funding of repair escrows and implementation of corrective measures.

60. Defendant never presented such options to Plaintiff.

61. Defendant never sought Plaintiff's instruction as to whether Plaintiff wished to fund escrow, pursue negotiated cure, sell the Property voluntarily, or otherwise mitigate risk.

62. Instead, strategy was executed without Plaintiff, Defendant's purported "client."

63. By the time Plaintiff discovered the lawsuit, receiver proceedings had advanced and the foreclosure trajectory was already in motion.

64. Although Plaintiff retained counsel and moved promptly to strike Defendant's unauthorized appearance and to dismiss claims against him, the procedural posture and prior admissions had already materially altered the case.

65. After Plaintiff retained independent counsel, discussions occurred with counsel for Fannie Mae concerning potential resolution of the FM Action. During those discussions, Plaintiff's counsel understood that Fannie Mae's primary concern related to property condition issues and the funding of repair escrows, and that foreclosure could have been halted upon deposit of appropriate repair funds and implementation of corrective measures, permitting the Property to be sold in an orderly fashion.

66. On information and belief, prior to foreclosure, Fannie Mae was willing to suspend or withdraw foreclosure proceedings if repair escrow funding was deposited and inspection access was meaningfully facilitated.

67. On further information and belief, Defendant, acting in concert with the Wercbergers and without consulting Plaintiff, rejected or obstructed such resolution efforts and instead pursued an adversarial litigation posture that escalated the dispute and narrowed available options.

68. Defendant made materially inaccurate representations regarding the condition of the Property and, on multiple occasions, resisted or obstructed full inspection access, including by providing selectively curated photographic materials and limiting meaningful evaluation of the Property's condition.

69. Had Defendant been acting in Plaintiff's interests and communicated resolution opportunities promptly, Plaintiff was ready, willing, and financially capable of funding repair escrows or pursuing a negotiated resolution that would have preserved the Property and allowed for voluntary sale.

70. Instead, by admitting execution of the forged guaranty without authorization, concealing the existence of the litigation, resisting inspection efforts, and declining reasonable cure opportunities, Defendant materially contributed to the loss of the Property and the resulting financial harm.

**G. Foreclosure, Settlement, and Cascading Financial Harm**

71. As the FM Action progressed along the trajectory set before Plaintiff had any knowledge of its existence, foreclosure proceedings advanced and the Property was ultimately lost.

72. The foreclosure did not occur after Plaintiff made a strategic decision to concede liability or abandon the asset. It occurred after critical admissions had already been entered in his name, after litigation posture had hardened, and after the opportunity for early intervention had materially narrowed.

73. During this period, Plaintiff, through counsel, issued cease-and-desist communications to mortgage brokers and related parties directing that no refinancing transactions proceed on other investment properties without his express authorization. Plaintiff was actively attempting to prevent further financial exposure and unauthorized restructuring of his investments.

74. Notwithstanding those efforts, and in the context of parallel proceedings involving the Wercbergers, refinancing transactions were ultimately compelled to proceed as part of a framework to resolve the FM Action. On information and belief, refinancing proceeds and financial restructuring involving other properties in which Plaintiff held interests were utilized in connection with resolving the FM Action.

75. As a result, the financial consequences extended beyond the loss of the Sunrise Villas property. Plaintiff suffered the loss of equity in the Property, incurred significant legal expenses, and experienced cascading economic harm affecting additional real estate investments and related business interests.

76. Defendant's unauthorized representation and admissions deprived Plaintiff of:

    a. The opportunity to contest the authenticity and enforceability of the purported guaranty at the outset;

    b. The opportunity to immediately cure alleged defaults before litigation escalated;

    c. The opportunity to negotiate from a position of credibility before binding admissions were made;

    d. The opportunity to pursue a voluntary sale prior to foreclosure; and

    e. The opportunity to control litigation strategy affecting his personal liability and financial exposure.

77. Instead, Plaintiff was kept entirely in the dark while binding judicial admissions were entered in his name and litigation decisions with profound financial consequences were made without his knowledge or consent.

78. The loss of the Property and the cascading financial harm that followed were direct, foreseeable, and proximate consequences of Defendant's unauthorized and tortious conduct.

## COUNT I
### Breach of Fiduciary Duty

79. Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

80. By entering an appearance on Plaintiff's behalf in the FM Action, Defendant undertook to act as Plaintiff's attorney and fiduciary.

81. An attorney-client relationship gives rise to fiduciary duties, including duties of loyalty, candor, disclosure, and obedience to client direction.

82. Defendant breached those fiduciary duties by, inter alia:

   a. Entering an appearance without authorization;

   b. Failing to communicate the existence of the lawsuit;

   c. Admitting execution of the Guaranty without consulting Plaintiff;

   d. Concealing material developments in the FM Action;

   e. Continuing to represent Plaintiff after receiving written notice that Plaintiff never authorized such representation;

   f. Acting in a manner aligned with the interests of others rather than Plaintiff;

   g. Rejecting or obstructing potential cure opportunities without client instruction.

83. Defendant's conduct constituted a knowing and intentional breach of the duties of loyalty and disclosure.

84. As a direct and proximate result of Defendant's breaches of fiduciary duty, Plaintiff suffered the loss of the Property, loss of equity, legal expenses, loss of reputation and good will, personal guaranty exposure, and cascading financial harm affecting additional real estate interests.

85. Defendant's conduct was willful, reckless, and in conscious disregard of Plaintiff's rights, warranting an award of punitive damages.

## COUNT II
### Legal Malpractice (Negligence)

86. Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

87. Defendant owed Plaintiff a duty to exercise the ordinary reasonable skill and knowledge commonly possessed by members of the legal profession.

88. Defendant breached that duty by:

   a. Failing to confirm authorization before appearing;

   b. Failing to communicate material case developments;

   c. Making binding judicial admissions without client consent;

   d. Failing to investigate the authenticity of the purported guaranty;

   e. Failing to present or communicate cure and settlement opportunities;

   f. Continuing representation after notice of lack of authority.

89. But for Defendant's negligence, Plaintiff would not have suffered the loss of the Property and related financial harm.

90. As a direct and proximate result of Defendant's malpractice, Plaintiff sustained damages in an amount to be determined at trial but exceeding $75,000.

## COUNT III
### Unauthorized Assumption of Agency / Acting Without Authority

91. Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

92. Defendant assumed to act as Plaintiff's agent in the FM Action by filing a notice of appearance and Answer in Plaintiff's name.

93. Defendant did so without authorization from Plaintiff and without any retainer agreement or communication conferring authority.

94. By filing pleadings and making binding judicial admissions on Plaintiff's behalf, Defendant purported to bind Plaintiff to legal positions affecting his personal liability.

95. A person who assumes to act as an agent for another without authority is liable for the damages proximately caused by such unauthorized conduct.

96. Defendant's unauthorized assumption of agency directly resulted in binding admissions regarding execution of the Guaranty and materially affected the procedural posture of the FM Action.

97. As a direct and proximate result of Defendant's unauthorized actions, Plaintiff suffered the loss of the Property, financial exposure, legal expense, and cascading economic harm.

98. Defendant is liable for all damages resulting from his unauthorized assumption of agency.

**WHEREFORE**, Plaintiff Shimon Weinberger respectfully demands judgment against Defendant S. Joshua Kahane as follows:

A. Awarding compensatory damages in an amount to be determined at trial but believed to exceed $75,000, including but not limited to:

1. Loss of equity in the Sunrise Villas property;
2. Financial losses resulting from foreclosure and related restructuring;
3. Legal fees and expenses incurred as a result of Defendant's conduct;
4. Consequential and cascading economic damages affecting Plaintiff's other real estate interests and business holdings;

B. Awarding punitive damages in an amount sufficient to punish Defendant's willful and reckless misconduct and to deter similar conduct in the future;

C. Awarding pre-judgment and post-judgment interest as permitted by law;

D. Awarding costs and disbursements of this action;

E. Awarding such other and further relief as the Court deems just and proper.

## JURY DEMAND

**Plaintiff hereby demands a trial by jury on all issues so triable.**

                      YVLS LAW

By: _____
Yifat V. Schnur
22 Prescott Street,
Edison, NJ, 08817
Telephone: (347) 268-5347
Email: Yifat@yvlslaw.com
*Attorneys for Shimon Weinberger*